**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOUNT SINAI HOSPITAL; MOUNT SINAI BETH ISRAEL; and ST. LUKE'S-ROOSEVELT HOSPITAL,<br><br>*Plaintiffs,*<br><br>v.<br><br>CVS HEALTH CORPORATION; CAREMARKPCS HEALTH, LLC; CAREMARK, LLC; WELLPARTNER, LLC; and JOHN DOES 1-15,<br><br>*Defendants.* | Case No. 26-cv-4143 |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


FRIER LEVITT, LLC
One World Trade Center
285 Fulton Street, Suite 45E
New York, NY 10007

84 Bloomfield Avenue
Pine Brook, NJ 07058

Jonathan E. Levitt
Matthew J. Modafferi
Todd Mizeski

Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
mmodafferi@frierlevitt.com
tmizeski@frierlevitt.com

*Attorneys for the Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 3

A. The Agreements and Relevant Provisions .......... 3

B. Vertical Integration Was Necessary for the Execution of Defendants' Pricing Scheme .......... 4

C. Plaintiffs' Audit Demand and Defendants' Retaliatory Termination .......... 6

LEGAL STANDARD .......... 6

ARGUMENT .......... 6

I. Plaintiffs' Breach of Contract Claims Are Properly Asserted Against All Defendants .......... 6

A. CaremarkPCS, Wellpartner, and CVS Health Are Parties to the Agreements .......... 6

B. CaremarkPCS, Wellpartner, and CVS Health Are Alter Egos of CVS Specialty .......... 9

C. The Complaint Adequately Identifies the Contractual Provisions Breached .......... 10

D. Defendants Breached Their Promise to Comply with HRSA/OPA Guidelines .......... 10

II. Plaintiffs' Audit-Related Contract Claim Satisfies the Notice-Pleading Standard .......... 12

III. Plaintiffs Adequately Plead a Violation of the Implied Covenant .......... 13

A. The Implied Covenant Claim Relating to Underpayment by CVS Specialty is Distinct From the Contract Claim .......... 13

B. The Implied Covenant Claim Based Upon the Retaliatory Termination is Viable Under New York Law .......... 14

IV. Plaintiffs State a Viable Claim for Fraud .......... 14

V. Plaintiffs State a Viable Claim for Tortious Interference with Contract .......... 17

A. Plaintiffs Adequately Pled a Breach .......... 17

B. Defendants' Corporate Relationship Does Not Negate the Tortious Interference Claim ....18

C. The Complaint Plausibly Alleges Intentional Procurement Without Justification ....19

D. Defendants' Reliance on the Agreements' Termination Provisions is Misplaced ....20

VI. Plaintiffs Plausibly Allege a Claim for Unjust Enrichment ....20

A. The Parties' Dispute Over the Terms and Scope of the Agreement Precludes Dismissal of the Unjust Enrichment Claim ....20

B. Plaintiffs Plausibly Allege Defendants Were Enriched at Plaintiffs' Expense ....21

VII. Plaintiffs Adequately Plead RICO Violations ....22

A. Plaintiff May Pursue its RICO Claim Alongside its Breach of Contract Claim ....22

B. Plaintiff Has Properly Alleged a RICO Enterprise ....23

C. Plaintiffs Adequately Plead Predicate Acts ....24

1. Defendants' Violation of 18 U.S.C. § 664 and 18 U.S.C. § 1954 Proximately Caused Plaintiffs' Injury ....24

2. Plaintiffs Have Sufficiently Pled Each Predicate Act ....25

VIII. The Court Should Not Dismiss the New York General Business Law Claim ....29

IX. The Complaint Contains Sufficient Facts as to CVS Health's Direct Participation ....29

CONCLUSION ....30

## TABLE OF AUTHORITIES

### CASES

*25 Bay Terrace Assoc., L.P. v. Public Serv. Mut. Ins. Co.*, 194 A.D.3d 668 (2d Dep't 2021)........................13

*Adelphia Communs. Corp. v. Bank of Am., N.A.*,
2007 Bankr. LEXIS 2851 (Bankr. S.D.N.Y. Aug. 17, 2007)..........................................................10

*Alony v. Chaitchik*, 2026 WL 621513 (S.D.N.Y. Mar. 5, 2026) ..................................................22

*AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432 (S.D.N.Y. 2008)......................................26

*Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*,
346 F. Supp. 3d 432 (S.D.N.Y. 2018)...........................................................................................22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 6, 10

*Bona v. Barasch*, 2003 U.S. Dist. LEXIS 4186 (S.D.N.Y. Mar. 20, 2003)..................................24

*Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir. 1995)......................................18

*Boyle v. U.S.*, 556 U.S. 938 (2009)..........................................................................................23

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs.*, 98 F.3d 13 (2d Cir. 1996) ..............................14

*Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551 (S.D.N.Y. 2004)........................................11

*Buyers & Renters United to Save Harlem v. Pinnacle Group NY LLC*,
575 F. Supp. 2d 499 (S.D.N.Y. 2008)...........................................................................................23

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) .......................................................23

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)..........................................................20

*Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26 (2d Cir. 1987) .............................................20

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382 (1987) .............................................21

*Colorado v. Trump*, 823 F. Supp. 3d 1251 (D. Colo. 2026)...............................................................13

*DiTella v. TransUnion, LLC*, 2024 WL 3594567 (S.D.N.Y. Jul. 31, 2024) .........................................7

*Empire Merchs., LLC v. Reliable Churchill LLP*, 902 F.3d 132 (2d Cir. 2018)...................................25

*ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35 (S.D.N.Y. 1999)..........................................................8

*Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682 (1969) ....................18

*Financial Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395 (2d Cir. 2015) ....................6

*First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287 (1st Dep't 1999) ....................15

*Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511 (2012) ....................22

*Greene v. Long Island R.R.*, 280 F.3d 224 (2d Cir. 2002) ....................29

*Grochowski v. Phoenix Constr.*, 318 F.3d 80 (2d Cir. 2003) ....................11

*Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169 (2021) ....................29

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) ....................24, 25

*Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171 (E.D.N.Y. 2019) ....................11

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132 (2009) ....................21

*Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. All., Inc.*, 2007 WL 1701813 (S.D.N.Y. June 11, 2007) ....................7, 9

*In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98 (2d Cir. 2015) ....................14

*JLO Dev. Corp. v. Amalgamated Bank*, 232 A.D.3d 705 (2d Dep't 2024) ....................14

*Kahuna Grp. v. Scarano Boat Bldg.*, 984 F. Supp. 109 (N.D.N.Y. 1997) ....................8

*Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263 (S.D.N.Y. 2023) ....................8

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ....................6

*Levy v. Credit Plus, Inc.*, 2023 WL 2644352 (S.D.N.Y. Mar. 27, 2023) ....................7

*Life Technologies Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270 (S.D.N.Y. 2011) ....................7

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173 (2011) ....................22

*Martin v. Tumblr, Inc.*, 2017 WL 11665339 (S.D.N.Y. Feb. 10, 2017) ....................14

*MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380 (S.D.N.Y. 2009) ....................7

*Meeks v. Experian Info. Servs., Inc.*, 2022 WL 17958634 (9th Cir. Dec. 27, 2022) ....................7

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171 (2d Cir. 2007) ....................16, 23

*Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135 (1993) ....................9

*Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201 (S.D.N.Y. 2016) ....................21

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60 (2d Cir. 2018) ....................22

*N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.,* 766 F.3d 212 (2d Cir. 2014) ....................29

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614 (1996) ....................19

*NLD Rochester LLC v. 440 Lake Ave., LLC*,
686 F. Supp. 3d 248 (W.D.N.Y. 2023) ....................22

*Northwell Health, Inc. v. Group Hospitalization & Medical Services, Inc.*,
2026 WL 2035965 (2d Cir. 2026) .................... 21, 22

*P&G Auditors & Consultants, LLC v. Mega Int'l Commer. Bank Co.*,
2019 WL 4805862 (Sept. 30, 2019) ....................13

*Petrello v. White*, 412 F. Supp. 2d 215 (E.D.N.Y. 2006) ....................12

*Plavin v. Group Health, Inc.*, 35 N.Y.3d 1 (2020) ....................29

*Principle Homecare, LLC v. McDonald*, 158 F.4th 326 (2d Cir. 2025) ....................6

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339 (2d Cir. 1994) ....................24

*Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, 2024 WL 3835264 (S.D.N.Y. Aug. 14, 2024) ....................19

*Rynasko v. N.Y. Univ.*, 63 F.4th 186 (2d Cir. 2023) ....................21

*Schmuck v. U.S.*, 489 U.S. 705 (1989) ....................28

*Schuman v. Visa U.S.A., Inc.*, 788 F. Supp. 3d 563 (S.D.N.Y. 2025) ....................29

*Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995) ....................23

*Spano v. V & J Nat'l Enters.*, 264 F. Supp. 3d 440 (W.D.N.Y. 2017) ....................8

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
985 F.2d 102 (2d Cir. 1993) ....................22

*U.S. ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493 (6th Cir. 2007) ....................17

*U.S. v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593 (S.D.N.Y. 2013) ....................17, 25, 26

*Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996) ....................9

*Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497 (S.D.N.Y. 2017) .............................. 15, 22

*Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131 (2d Cir. 1991) ..........................................9

*Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555 (2d Cir. 1985)....................................................17

**STATUTES**

18 U.S.C. § 664........................................................................................................................24, 25, 26

18 U.S.C. § 1343..................................................................................................................................28

18 U.S.C. § 1954........................................................................................................................24, 25, 27

42 U.S.C. § 256b..................................................................................................................................11

**AGENCY RULEMAKING**

75 Fed. Reg. 10,272 ...................................................................................................................... 11, 12

**FEDERAL RULES**

Fed. R. Civ. P. 8(a)(2) .........................................................................................................................10

Fed. R. Civ. P. 8(d)(2)-(3)............................................................................................................... 19, 21

Fed. R. Civ. P. 9(b) ........................................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................................................6

**OTHER AUTHORITIES**

Health Resources & Services Administration, *Contract Pharmacy Services* (June 2024), https://www.hrsa.gov/opa/implementation-contract..........................................................................11

HRSA, *Program Integrity: FY22 Audit Results* (Feb. 23, 2026), https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results .........................................................................................................12

**PRELIMINARY STATEMENT**

CVS Health and its subsidiaries were caught in a conspiracy to divert hundreds of millions of dollars in 340B Savings specifically earmarked for the public benefit.[1] The First Amended Complaint ("Complaint") provides a detailed account of each Defendants' role in this scheme, and how cooperation between them was necessary to its success. In short, the Complaint alleges that Defendants secretly manipulated 340B-eligible claims to create a "Spread" between the fair market reimbursement paid in connection with the initial adjudication of such claims, and the artificially reduced reimbursement paid in connection with Defendants' re-adjudication of the same. In their Motion to Dismiss ("Motion"), Defendants try their best to downplay these allegations by deriding the 340B Program as "politically controversial" and describing this case as nothing more than a contract dispute. But the allegations contained in the Complaint give rise to claims far more significant.

In an attempt to escape accountability, Defendants make a slew of arguments that miss the mark. For example, as to Plaintiffs' contract claims, Defendants argue that only Caremark, LLC d/b/a CVS Specialty is bound by the Agreements,[2] and that Plaintiffs' failure to attach the Agreements or plead any alleged breach with specificity warrants dismissal. However, the Agreements expressly incorporate CVS Specialty and *its affiliates* including non-signatory Defendants, who performed services under the Agreements and received benefits directly therefrom. And federal rules do not require that plaintiffs attach copies of the contract to survive a motion to dismiss. As discussed below, Plaintiffs' allegations satisfy the notice-pleading standard requiring merely that plaintiffs allege facts establishing the substance of the contractual obligation, Defendants' failure to perform, and damages.

---

[1] 340B Savings refers to the difference between the acquisition cost 340B-eligible drugs and the reimbursement covered entities receive from payors. *See* Compl. ¶ 2.

[2] The sole contract involved in this matter is the Pharmacy Services Agreement ("Agreement") between each of the Plaintiffs, on the one hand, and Caremark LLC *and its affiliates* on the other.

Defendants' Motion also suffers from several inconsistencies. For instance, Defendants argue that any reduction of the reimbursement paid to CVS Specialty for dispensing 340B-eligible drugs falls outside the scope of Plaintiffs' contract claim because the Agreements do not address what reimbursement is paid to CVS Specialty by CaremarkPCS Health, LLC ("CaremarkPCS"). But when Plaintiffs assert that the same conduct constitutes fraud, tortious interference, and unjust enrichment, Defendants protest that the claims are duplicative of the contract claims. Defendants cannot have it both ways. Where, as here, the meaning of contractual terms is disputed, courts routinely deny motions to dismiss contract claims as well as claims pled in the alternative.

Defendants' challenge to other claims is equally unavailing. Specifically, Defendants argue that the Complaint never identifies the circumstances surrounding any alleged misrepresentations. This argument ignores the well-pled allegations dissecting Defendants' pricing scheme to divert 340B Savings, their transmission of false data to conceal that diversion, refusal to permit an audit that would have exposed the scheme, and termination of the Agreement when Plaintiff pressed the issue. There is no question that these allegations provide Defendants fair notice of Plaintiffs' fraud claim.

The same applies to Plaintiffs' RICO claim. The Complaint offers a wealth of factual allegations that Defendants participated in an association-in-fact enterprise with the common goal of diverting monies to which they were not entitled. The Complaint describes each Defendant's role in that enterprise and the facts giving rise to each predicate act. Defendants ignore these well-pled allegations and, instead, cherry-pick snippets from the Complaint and declare them vague, oftentimes blaming Plaintiffs for not alleging factual minutiae not needed to prove any predicate act.

These are just some of the legal defects plaguing Defendants' Motion. Taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Complaint provides sufficient factual allegations to plausibly suggest that CVS Health and its subsidiaries breached the

Agreement and fraudulently diverted millions of dollars of 340B revenue that should have flowed to Plaintiffs. Accordingly, the Court should deny Defendants' Motion entirely.

## <u>FACTUAL BACKGROUND</u>[3]

Plaintiffs, Mount Sinai Hospital, St. Luke's-Roosevelt Hospital, and Mount Sinai Beth Israel, are non-profit hospitals located in New York City that serve Medicaid and uninsured patients. Compl. ¶¶ 1, 4, 26-29. As "Covered Entities" under the federal 340B Drug Pricing Program ("340B Program"), Plaintiffs are authorized to purchase outpatient drugs at discounted prices from manufacturers and use the resulting 340B Savings (*i.e.*, the difference between those discounted acquisition costs and the reimbursement received from third-party payors) to fund indigent care. *Id.* ¶¶ 1, 49-52, 55-57. As relevant here, Plaintiffs entered into Pharmacy Services Agreements ("Agreements") with CVS Specialty *and its affiliates* for the purpose of dispensing drugs to 340B-eligible patients. *Id.* ¶¶ 4.

### A. The Agreements and Relevant Provisions

The Agreements expressly define the contracting party as CVS Specialty "and its affiliates" collectively, not CVS Specialty standing alone. Compl. ¶¶ 90-91. Under the Agreements, the pharmacy (*i.e.*, CVS Specialty and its affiliates) must remit to Plaintiffs all reimbursement it receives from third-party payors for dispensing 340B drugs for the originally adjudicated claim, less an agreed dispensing fee (hereinafter, the "340B Remittance"). *Id.* ¶¶ 6, 91-92, 172-173. This means that *all* reimbursement from payors must be passed through to Plaintiffs, minus the agreed-upon dispensing fee. *Id.* The Agreements further require that CVS Specialty comply with HRSA and Office of Pharmacy Affairs ("OPA") regulations and guidelines governing contract pharmacy services. Compl. ¶¶ 100, 174. To

[3] Plaintiffs provide a concise summary of the parties' relationship and the underlying dispute. Ultimately, the factual allegations in the Complaint, not Defendants' misstated narrative, control.

that end, the Agreements contain an audit provision giving Plaintiffs the right to audit CVS Specialty's books and records to ensure 340B Program integrity. *Id.* ¶¶ 19, 94-98, 175.

**B. Vertical Integration Was Necessary for the Execution of Defendants' Pricing Scheme**

The scheme cannot function without the cooperation of each Defendant. Compl. ¶ 155. When a 340B-eligible patient fills a prescription at CVS Specialty, CVS Specialty processes the prescription and submits a claim for reimbursement to CaremarkPCS. *Id.* ¶ 10. The claim is adjudicated by CaremarkPCS under the standard reimbursement rate for that patient's network. *Id.* That original reimbursement amount reflects the fair market value for the drug dispensed. *Id.* ¶ 13. CaremarkPCS communicates that original reimbursement to CVS Specialty and directs the pharmacy to collect the patient's co-payment, which is calculated based on the original reimbursement. Compl. ¶¶ 10, 76, 81-82, 107. CaremarkPCS then remits payment to CVS Specialty in accordance with that original reimbursement amount. *Id.* ¶¶ 10, 73, 107. Under the Agreements, CVS Specialty is required to pass through to Plaintiffs the original reimbursement it received for dispensing the patient's drug, less the agreed-upon dispensing fee. Compl. ¶ 109. At the time the patient receives the drug, none of the parties know the patient is 340B-eligible, and the transaction is treated no differently than any other pharmacy transaction. *Id.* ¶ 107. It is not until Wellpartner flags the original claim as 340B-eligible and communicates that information to CaremarkPCS and CVS Specialty that the scheme begins. *Id.* ¶ 11.

Unbeknownst to Plaintiffs, CaremarkPCS and CVS Specialty undo the originally adjudicated claim and reprice it using an artificially reduced reimbursement amount that is much lower than the original cost, even though the patient already paid a copayment based on the original claim. *Id.* ¶¶ 11-12, 86, 111-112, 119-121, 137. Defendants then retain the difference between the reimbursement paid on the originally adjudicated claim and the reimbursement amount paid on the reprocessed claim. *Id.* ¶¶ 11-15, 84, 86, 110-121. Wellpartner then provides Plaintiffs with false reporting instruments that helped conceal the scheme. *Id.* ¶¶ 113-114. The following illustration helps summarize the scheme:




Defendants exploited their vertical integration of CVS Health's pharmacy benefit manager, CaremarkPCS, Third Party Administrator ("TPA"), Wellpartner, and specialty pharmacy, CVS Specialty, to divert more than half of the 340B Savings to which Plaintiffs were entitled. *See* Compl. ¶¶ 8-25, 85-86, 105-160. Cooperation was an essential ingredient to the plot, requiring: (1) CaremarkPCS to slash reimbursement rates on previously adjudicated and paid claims after the point of sale; (2) CVS Specialty to willingly accept that reduced reimbursement (and dispensing fee); and (3) Wellpartner to mask the true transaction from Plaintiffs through falsified documents. *Id.* ¶¶ 10-11, 107-21, 155. The close coordination among Defendants is further evident from: (1) the mandatory tying arrangement requiring 340B Covered Entities using CVS Specialty as their contract pharmacy to also use Wellpartner as their TPA, *Id.* ¶ 79; and (2) the fact CVS Specialty was forced to accept a dispensing fee below fair market value to make the scheme work, demonstrating the absence of any arms' length bargaining between CaremarkPCS and CVS Specialty. Compl. ¶ 148.

### C. Plaintiffs' Audit Demand and Defendants' Retaliatory Termination

In November 2025, Plaintiffs served an audit demand seeking the data supporting the original adjudication of all 340B-eligible claims at the point of sale (the "first set of books"). *Id.* ¶¶ 161-63. At that time, the only data available to Plaintiffs was the false remittance reports provided by Wellpartner, which only showed data supporting the reprocessed claims (the "second set of books"). *Id.* ¶¶ 112-114, 163. Despite Plaintiffs' contractual right to audit, Defendants refused before terminating the Agreements for no apparent reason other than to retaliate against Plaintiffs for pressing the issue. *Id.* ¶¶ 23, 165-166, 232-233, 249. Based on information and belief, documents produced in response to the audit would have provided Plaintiffs with additional proof of the scheme, the names of each John Doe involved in its execution, and the damage it caused. Plaintiffs filed suit shortly thereafter.

## LEGAL STANDARD

Under Fed. R. Civ. P. 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint "does not need detailed factual allegations" to survive a motion to dismiss. *Id.* at 555. The Court must "accept[] the allegations in the complaint as true and draw[] all reasonable inferences in favor of the plaintiff." *Principle Homecare, LLC v. McDonald*, 158 F.4th 326, 330 (2d Cir. 2025) (per curiam). Factual disputes are not grounds for dismissal. *Financial Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 405 (2d Cir. 2015). It is the movant's burden to show that plaintiff failed to state a claim. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). Defendants have not met this burden.

## ARGUMENT

### I. Plaintiffs' Breach of Contract Claims Are Properly Asserted Against All Defendants

### A. CaremarkPCS, Wellpartner, and CVS Health Are Parties to the Agreements

Defendants argue that Plaintiffs' contract claims fail against CVS Health, CaremarkPCS, and Wellpartner because Plaintiff "contract[ed] only with Caremark, LLC." Mot. to Dismiss (ECF Doc.

41) ("Mot.") at 8-9. However, "[t]he Agreements impose obligations not merely on Caremark but also *their affiliates*." Compl. ¶¶ 90-91, 173 (emphasis added). The Complaint further alleges that each Defendant intentionally influenced CVS Specialty's contractual obligation to pass through the originally adjudicated reimbursement for 340B-eligible claims. Specifically, CaremarkPCS reduced the reimbursement paid to CVS Specialty, causing CVS Specialty to remit an artificially reduced amount to Plaintiffs while CVS Health retained the Spread. *Id.* ¶¶ 111, 126. To conceal this breach, Wellpartner provided Plaintiffs with false remittance reports that misrepresented the reimbursement received by CVS Specialty. *Id.* ¶ 112. CVS Health and its officers (named as John Does 1-5) designed and implemented this scheme, which required coordination among numerous vertically integrated entities within the CVS corporate structure. (Compl. ¶¶ 37, 105, 220-222).

When presented with similar facts, the Ninth Circuit held that a non-signatory (*i.e.,* EIS) was party to an arbitration agreement entered into by its sister company (*i.e.,* ECS), because the agreement defined ECS as including its affiliates. *Meeks v. Experian Info. Servs., Inc.*, 2022 WL 17958634, at *5 (9th Cir. Dec. 27, 2022). In reaching this conclusion, the Ninth Circuit found that EIS "play[ed] a role" in providing consumer reporting services under the agreement, and thereby "assented to be bound" by the agreement's terms despite not having signed it. *Id.* at *6. This Court has adopted the Ninth Circuit's reasoning. *DiTella v. TransUnion, LLC*, 2024 WL 3594567, at *16-17 (S.D.N.Y. Jul. 31, 2024); *Levy v. Credit Plus, Inc.*, 2023 WL 2644352, at *17 (S.D.N.Y. Mar. 27, 2023). The same rationale applies here.

Moreover, a non-signatory can be liable for breach of contract where its conduct "manifest[s] an intention to be bound by the contract," *MBIA Ins. Corp. v. Royal Bank of Can.*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009), or where the non-signatory receives benefits flowing directly from that contract, *Life Technologies Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 274 (S.D.N.Y. 2011). Such conduct can include "play[ing] a considerable role in the management and performance of the Contract." *Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. All., Inc.*, 2007 WL 1701813, at *18 (S.D.N.Y. June 11, 2007) (holding

non-signatory was bound by forum selection clause in contract where it had financial interests in how the contract was performed and "micro-managed" signatories' performance).[4] Such is the case here.

As discussed, Plaintiffs allege numerous facts revealing CaremarkPCS's, Wellpartner's and CVS Health's "intention to be bound by the [Agreements]" between Plaintiffs and CVS Specialty by directly providing services and engaging in conduct specifically geared towards controlling and/or managing CVS Specialty's performance under the Agreements. The contract pharmacy relationship between Plaintiffs and CVS Specialty created the basis upon which: (1) CaremarkPCS, the PBM, billed its payor clients and received the standard national network reimbursement rates for the 340B-eligible drugs; (2) conspired with CVS Specialty to claw back the point-of-sale reimbursement and reduce the paid amounts solely to generate "Spread" kept by CVS Health; (3) Wellpartner directly served Plaintiffs under the Agreements by flagging which claims were 340B-eligible and reporting to Plaintiffs the reimbursement received by CVS Specialty; and (4) CVS Health directed and controlled CVS Specialty's performance under the Agreements by designing and implementing the pricing scheme that fixed the reimbursement amounts remitted to Plaintiffs, while retaining the resulting Spread for itself. *See* Compl. ¶¶ 3-14, 105-19, 146-51; *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 285 (S.D.N.Y. 2023); *Spano v. V & J Nat'l Enters.*, 264 F. Supp. 3d 440, 453 (W.D.N.Y. 2017).

To distract from these facts, Defendants argue that CaremarkPCS is a "different company engaged in a different line of business." But the pricing scheme works because CaremarkPCS and CVS Specialty conspired together to artificially reverse the original, successfully adjudicated claim, and re-adjudicate that claim for a lower reimbursement. Indeed, CaremarkPCS can only manufacture the 340B "Spread" after learning from Wellpartner that the claims already dispensed were 340B-eligible,

[4] *See ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 74 (S.D.N.Y. 1999) (denying motion to dismiss contract claims against non-signatory where contract "evince[d]" non-signatory's "involvement and future assumption" of contract); *Kahuna Grp. v. Scarano Boat Bldg.*, 984 F. Supp. 109, 113 (N.D.N.Y. 1997) (denying summary judgment on breach of contract claim against a non-signatory defendant where it provided ship-building services under the contract).

and only on prescriptions that are serviced under the Agreements between CVS Specialty and Plaintiffs. This conduct by CaremarkPCS is akin to "micro-managing" a sister company's performance under the Agreements by affiliated entities with an obvious financial interest in how the contract is performed; facts that were sufficient to sustain a breach of contract claim against a non-signatory in *Impulse Mktg.*, 2007 WL 1701813, at *18. Thus, Plaintiffs' contract claims are properly pleaded against CaremarkPCS, Wellpartner, and CVS Health.

### B. CaremarkPCS, Wellpartner, and CVS Health Are Alter Egos of CVS Specialty

Alter ego liability provides an alternate route to the same conclusion. Under New York law, "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Morris v. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993). Factors considered by courts in determining whether one entity is dominated by another include the absence of corporate formalities, the amount of business discretion displayed by the dominated corporation, and whether related corporations deal with the dominated corporation at arms-length, among others. *Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 139 (2d Cir. 1991).

Here, the Complaint describes how Defendants exploited their vertical integration and common ownership/control by CVS Health to: (1) mandate the use of Wellpartner as the TPA for any Covered Entity that enters into a contract pharmacy relationship with CVS Specialty, Compl. ¶ 79; (2) require CVS Specialty to agree to a secret pricing arrangement with CaremarkPCS that *reduced* the dispensing fees earned by CVS Specialty, *id.* ¶ 148; and (3) reduce CVS Specialty's reimbursement on 340B claims to generate the "Spread" pocketed by Defendants. *Id.* ¶¶ 116, 119. Defendants influenced CVS Specialty to "act contrary to its own interests" in service of a broader scheme to defraud Plaintiffs. *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1145 (S.D.N.Y. 1996)

(denying a motion to dismiss contract claims against non-signatories based on allegations that corporate parent forced subsidiary to act contrary to its interests). For this reason, the non-signatory Defendants are proper parties to the contract claims.[5]

### C. The Complaint Adequately Identifies the Contractual Provisions Breached

Defendants state that Plaintiffs fail to identify "the specific terms of the contract" CVS Specialty breached because it does not attach the Agreements. Mot. at 8-10. However, the notice-pleading standard requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under that standard, "[a] plaintiff need not attach a copy of the contract to the complaint or quote the contractual provisions verbatim." *Adelphia Communs. Corp. v. Bank of Am., N.A.,* 2007 Bankr. LEXIS 2851, at *18 (Bankr. S.D.N.Y. Aug. 17, 2007). Rather, a plaintiff adequately pleads a contract claim by identifying the substance of the contractual obligation, the defendant's failure to perform, and resulting damages. *See Twombly*, 550 U.S. at 555-56.

The Complaint describes Defendants' contractual obligations, including: (1) the provision requiring CVS Specialty and its affiliates to remit to Plaintiffs all reimbursement received from third-party payors for 340B drugs dispensed, less the agreed upon dispensing fee, Compl. ¶¶ 6, 91-92, 172-73; (2) the provision requiring CVS Specialty and affiliates to comply with HRSA and OPA regulations and guidelines governing Contract Pharmacy services, *Id.* ¶¶ 100, 174; and (3) the audit provision granting Plaintiffs the right to audit Defendants' books and records. *Id.* ¶¶ 95-97, 175. These detailed allegations more than satisfy the notice-pleading standard.

### D. Defendants Breached Their Promise to Comply with HRSA/OPA Guidelines

Defendants argue that: (i) no HRSA regulation requires that all 340B savings accrue to Covered Entities, (ii) HRSA lacks authority to regulate contract pharmacies, and (iii) Plaintiffs cannot use a

---

[5] Notably, the "small difference in lost dispensing fee pales in comparison to the large Spread that CVS Health/CaremarkPCS receives," and "the scheme results in a huge net positive for the Defendants." Compl. ¶ 149.

contract claim to enforce a statute lacking a private right of action. Mot. at 10-11. Each argument mischaracterizes Plaintiffs' claim.

Plaintiffs are *not* asserting a private right of action directly under 42 U.S.C. § 256b. Rather, Plaintiffs are enforcing the Agreements' express terms requiring CVS Specialty and its affiliates to comply with the HRSA's Contract Pharmacy Services Guidelines including those published at 75 Fed. Reg. 10,272 (Mar. 5, 2010 Final Notice). Compl. ¶¶ 100, 174.[6] These guidelines make clear that Covered Entities, not PBMs or contract pharmacies, decide how to spend the 340B revenues generated from the contract pharmacy relationship. *Id.* at 10,277. Enforcing that contractual undertaking is entirely distinct from pursuing a private right of action under the 340B statute itself. Moreover, courts have found that laws without a private right of action may form the basis of a breach of contract claim if expressly incorporated into the contract. *See Hymes v. Bank of Am., N.A.*, 408 F. Supp. 3d 171, 199 (E.D.N.Y. 2019) (denying motion to dismiss breach of contract claims based on violations of N.Y. GOL § 5-601 which was incorporated into contract).[7] The Complaint alleges that HRSA's guidelines are incorporated into the Agreement. Accepted as true, violation of these guidelines may form the basis of a contract claim.

---

[6] *See* Health Resources & Services Administration, *Contract Pharmacy Services* (June 2024), https://www.hrsa.gov/opa/implementation-contract ("The Notice Regarding 340B Drug Pricing Program — Contract Pharmacy Services […] provides guidelines for the operation and compliance of contract pharmacies.").

[7] Defendants cite *Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 558 (S.D.N.Y. 2004) for the proposition that a breach of contract claim cannot be brought for violations of statutes or regulations expressly incorporated into the contract where the law does not provide a private right of action. However, the *Broder* court distilled too broad a rule from the cited authority, *Grochowski v. Phoenix Constr.*, 318 F.3d 80 (2d Cir. 2003), which held that a breach of contract action was unavailable to enforce the Davis-Bacon Act because that statute provided a "regulatory scheme providing administrative remedies." *Id.* at 85. The 340B statute does not create any administrative remedies for misconduct by contract pharmacies. On the contrary, HRSA regulations make clear that Covered Entities' recourse against non-compliant pharmacies is *contractual* in nature and based on the agreement between private parties. *See* 75 Fed. Reg. at 10,274 ("Covered entities have the responsibility to have ***agreements with contract pharmacies and procedures in place*** sufficient to enable the covered entity to meet its obligations under the law" (emphasis added)).

## II. Plaintiffs' Audit-Related Contract Claim Satisfies the Notice-Pleading Standard

The Agreements contain clear audit provisions with which Defendants refused to comply. Compl. ¶¶ 94-99. Now, after refusing the audit altogether, Defendants argue that Plaintiffs: (i) failed to allege any "specifics" concerning the audit procedures; and (ii) failed to plead damages attributable to the audit denial. *See* Mot. at 11-12. Each argument fails.

First, the Complaint alleges breach of the audit provision with the level of specificity required by Rule 8's notice-pleading standard as discussed above. *See* Factual Background, Section (C).

Second, Plaintiffs have identified damages arising from this claim since the denial of an audit is: (1) plainly related to the already-pled $121 million in losses since an audit would have permitted Plaintiffs to identify and recover the loss; and (2) inextricably linked to the termination of the Agreements, resulting in lost 340B remittances. Furthermore, the requested remedy here is specific performance (*i.e.*, undoing the retaliatory terminations and requiring CVS Specialty to comply with the audit) for which monetary damages are inadequate. Compl. ¶¶ 248-250; *Petrello v. White*, 412 F. Supp. 2d 215, 230 (E.D.N.Y. 2006). Performance of the audit is not just required under the Agreements, but also exactly what HRSA expects.

HRSA guidelines require contract pharmacies to provide Covered Entities access to their books and records to ensure compliance with the 340B program's requirements. Compl. ¶ 94; *see* 75 Fed. Reg. 10,272, 10,278 (contract pharmacy must "assure that all pertinent reimbursement accounts and dispensing records…will be made available to the covered entity"). By refusing Plaintiffs' reasonable audit demand in violation of the Agreements and HRSA guidelines, Defendants exposed Plaintiffs to administrative sanctions and even potential termination from the 340B Program.[8] Courts

[8] HRSA routinely audits and sanctions Covered Entities for non-compliance with 340B Program Rules, including repayment of the 340B discounts to manufacturers and even termination of the contract pharmacy or covered entity facilities from the 340B program. *See, e.g.*, HRSA, *Program Integrity: FY22 Audit Results* (Feb. 23, 2026), https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results.

have held that agency enforcement actions that result in loss of funds can constitute irreparable injury. *See*, *e.g.*, *Colorado v. Trump*, 823 F. Supp. 3d 1251, 1278-79 (D. Colo. 2026) (finding irreparable harm arising from loss of administrative funds due to non-compliance with USDA rules).

Finally, Defendants argue that the denial of an audit cannot constitute a breach of contract because Defendants were entitled to terminate the Agreements. This argument fails because, as explained in Section III.B. below, the terminations were unlawful even if at-will.

## III. Plaintiffs Adequately Plead a Violation of the Implied Covenant

### A. The Implied Covenant Claim Relating to Underpayment by CVS Specialty is Distinct From the Contract Claim[9]

Defendants argue that Plaintiffs' implied covenant claim is "impermissibly duplicative" of its breach of contract claim. Mot. at 14. But the crux of Plaintiffs' implied covenant claim is that Defendants acted in bad faith by re-processing 340B claims at a lower reimbursement solely to deprive Plaintiffs of the 340B Savings thereby destroying "the fruit of the contract." *25 Bay Terrace Assoc., L.P. v. Public Serv. Mut. Ins. Co.*, 194 A.D.3d 668, 672 (2d Dep't 2021). To the extent Defendants interpret the Agreements as expressly allowing for this re-processing, this argument raises a dispute over the parties' expectations, which cannot be resolved on a motion to dismiss. *See P&G Auditors & Consultants, LLC v. Mega Int'l Commer. Bank Co.*, 2019 WL 4805862, at *15-16 (Sept. 30, 2019) ("because it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments [against simultaneous quasi-contract claims] as premature."). Accordingly, the Court should allow the implied covenant claim to proceed as an alternative to the contract claims.

---

[9] Defendants argue that the implied covenant claim must be dismissed against CaremarkPCS, WellPartner, and CVS Health because those entities are non-signatories to the Agreements. Mot. at 13-14. But, for the reasons discussed in Sections I.A-B, above, Plaintiffs allege facts sufficient to establish that the non-signatory Defendants are parties to the Agreements and/or alter egos of CVS Specialty.

### B. The Implied Covenant Claim Based Upon the Retaliatory Termination is Viable Under New York Law

Plaintiffs' implied covenant claim also encompasses the retaliatory termination of the Agreements. Defendants cite *In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 102 (2d Cir. 2015) and *Martin v. Tumblr, Inc.*, 2017 WL 11665339 (S.D.N.Y. Feb. 10, 2017) for the proposition that the implied covenant cannot impose obligations inconsistent with the contract's express terms. However, neither case involved the type of bad faith or retaliatory animus alleged here, where Defendants terminated the Agreements to prevent an audit that would have exposed the discriminatory pricing scheme. In so doing, Defendants frustrated Plaintiffs' expected benefits under the Agreement.

The New York Appellate Division recently concluded that a defendant's termination of an agreement to frustrate the other party's expected benefit was enough to state a claim for breach of the implied covenant regardless of the contractual right to terminate. *See JLO Dev. Corp. v. Amalgamated Bank*, 232 A.D.3d 705, 707 (2d Dep't 2024) (stating "[e]ven an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement"). Thus, regardless of whether the Agreements allowed for termination without cause, the implied covenant of good faith and fair dealing prohibits Defendants from terminating the Agreements to deprive Plaintiffs of their expected benefits. This includes, as relevant here, the ability to perform audits to ensure program integrity. Compl. ¶ 23.

## IV. Plaintiffs State a Viable Claim for Fraud

Defendants challenge the fraud claim on two narrow grounds: (1) that it impermissibly duplicates the contract claim, and (2) that it was not pleaded with particularity. Both arguments fail.

Plaintiffs may pursue fraud claims alongside breach of contract claims where the alleged misrepresentation is "collateral or extraneous" to the contract. *Bridgestone/Firestone, Inc. v. Recovery Credit*

*Servs.*, 98 F.3d 13, 20 (2d Cir. 1996).[10] Alleged misrepresentations are "collateral or extraneous" to the contract when they concern false statements of "present fact" made "prior to or within" performance of a contract as opposed to a "future intent" to fulfill some promise. *Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497, 506-507 (S.D.N.Y. 2017). "It is one thing to promise to perform a contract. It is quite something else to induce someone to enter a contract by lying as to one's financial conditions, present ability to perform, and the like." *Id.* at 506. "[I]t is the precise form the statement takes – present fact versus future intent to perform – that drives the analysis. *Id.*

Here, Plaintiffs allege that "Defendants represented the amount paid to Plaintiff was the total amount received, but Defendants had actual knowledge it was not." Compl. ¶ 202. They further allege that "Defendants made this representation knowing its falsity" and that Defendants later compounded that misrepresentation through the submission of false and misleading remittance reports by Wellpartner to Plaintiff. *Id.* ¶¶ 202, 220. These representations are extraneous to the contract because they caused Plaintiffs to assume additional undertakings including its "agree[ment] to allow Caremark LLC and CVS Specialty to act as a Contract Pharmacy in exchange for substantial dispensing fee and TPA fee." *Id.* ¶ 205. "Plaintiffs would not have entered into the Agreements had they known that Defendants would impose discriminatory pricing" that facilitated the scheme. *Id.* ¶¶ 203, 224. These allegations describe intentional misrepresentations by CVS Specialty and Wellpartner to create the impression that CVS Specialty and its affiliates performed fully under the Agreements.

In *First Bank of the Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291-92 (1st Dep't 1999), plaintiff alleged "that defendants intentionally misrepresented material facts about various individual loans so that they would appear to satisfy" certain "warranties by [defendant] in the Agreement." *Id.* at 292. The Appellate Division allowed plaintiff to pursue this fraud claim alongside its contract claim.

---

[10] The *Bridgestone* factors include what Defendants describe as a "duty independent of the contract." *See Bridgestone/Firestone*, 98 F.3d at 20. Contrary to Defendants' suggestion, however, these factors are disjunctive and no single factor controls.

*Id.* Much like the defendants in *First Bank of the Americas*, Defendants here made false representations of "present fact" relating to the dollar amount(s) that: (i) CaremarkPCS charged payors; (ii) CaremarkPCS paid CVS Specialty; (iii) CVS Specialty collected from patients in the form of co-pay; and (iv) Plaintiffs were entitled to in the form of reimbursement. *See, e.g., Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007) (acknowledging rule allowing "fraud claim[s] to proceed in tandem with a contract claim where the seller misrepresented facts as to the present condition of his property, even though these facts were warranted in the parties' contract."). Defendants cite numerous cases that supposedly dismiss fraud claims as duplicative or redundant of contract claims. *See* Mot. at 17-18. However, none of these decisions involved a coordinated effort by defendants to mislead plaintiff(s) through false reporting instruments to make it seem as though they performed fully under the contract.

Defendants also state that the fraud claim is redundant because it seeks the same damages as Plaintiffs' contract claim. *See* Mot. at 18. This argument is misplaced. Plaintiffs allege that they "received each Wellpartner electronic remittance report and, relying on its representation that the gross payment reflected therein was the full reimbursement[,]" "continued to pay substantial dispensing fees and TPA fees—none of which they would have done had they known the true amounts CaremarkPCS was receiving from payors at the point of sale." Compl. ¶ 224. Plaintiffs further allege that "[e]ach dispensing fee and TPA fee paid by Plaintiffs in reliance on Wellpartner's false remittance data constitutes a concrete, out-of-pocket financial loss." Compl. ¶ 224. Thus, Plaintiffs' injury includes not only the "delta between the amount [Plaintiffs] were paid and what they were allegedly owed under the contracts[,]" Mot. at 18, but also the dispensing and TPA fees paid by Plaintiffs on affected 340B-eliglble claims. Compl. ¶¶ 203, 224.

Defendants' "particularity" argument fails as well. "The purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information

to frame a response." *U.S. v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 615 (S.D.N.Y. 2013) (quotation omitted). "[T]he specificity requirement of Rule 9(b) is satisfied by allegations that identify who made the misstatements, the occasions on which these were made and the content of the misstatements." *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 561 (2d Cir. 1985).

When read in its entirety, Plaintiffs allege each element under Rule 9(b). *See* Fed. R. Civ. P. 9(b). Plaintiffs identify the speakers (Defendants), the misrepresentation (the "gross insurance payment" and patient co-pay), the form of the misrepresentation (the "remittance reports"), the interstate path of those misrepresentations, and their frequency (*i.e.*, monthly). The Complaint even provides numerous examples of claims on which Defendants perpetrated their scheme. *See* Compl. ¶ 122-141. These allegations provide "fair notice" of Plaintiffs' fraud claim as required by Rule 9(b).

According to Defendants, however, Rule 9(b) also requires allegations explaining all "contextual facts around any discussion in which a false statement was supposedly made," and the "individual name of the employee within Plaintiffs' organizations who heard or received the supposedly false statement." Mot. at 19. The law cuts against this argument. *See Wells Fargo Bank*, 972 F. Supp. 2d at 618 ("Where a plaintiff 'has alleged that [a] corporation has committed . . . fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the [plaintiff] must necessarily plead with particularity.'" (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 506 (6th Cir. 2007)). The Court should reject Defendants' attempt to stretch the standard of Rule 9(b).[11]

## V. Plaintiffs State a Viable Claim for Tortious Interference with Contract

### A. Plaintiffs Adequately Pled a Breach

Contrary to Defendants' assertion, Plaintiffs' breach of contract claim is thoroughly pled. *See* Section I, above. As discussed, the Agreements required CVS Specialty and its affiliates to remit all

[11] Notably, compliance with Plaintiffs' rightful audit request would have provided Plaintiffs with additional information regarding Defendants' scheme and allowed Plaintiffs to allege fraud with greater specificity.

reimbursement received from third-party payors for dispensing 340B drugs for the originally adjudicated claim, less an agreed dispensing fee (hereinafter, the "340B Remittance"). The Complaint provides numerous representative claims showing that Defendants failed to deliver on this promise. *Id.* ¶¶ 122-141. Plaintiffs further alleges that Defendants breached the Agreements by failing to comply with HRSA and OPA regulations/guidance, as well as failing to respond to Plaintiff's audit demand. *Id.* ¶¶ 100, 104, 156, 159, 174.

### B. Defendants' Corporate Relationship Does Not Negate the Tortious Interference Claim

Defendants claim that CVS Health, CaremarkPCS, and Wellpartner could not have interfered with the Agreements because they are part of the same corporate family as CVS Specialty. Mot. at 20. When determining whether the corporate family doctrine applies, courts consider whether the affiliate used "wrongful means to interfere with another's contractual rights" and whether its actions "were wrongful in the first place." *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1035 (2d Cir. 1995). The corporate family doctrine provides only a qualified privilege when an affiliate acts in the contracting party's interest without engaging in wrongful conduct, such as fraud or malice. *See Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969) (recognizing a qualified privilege to protect one's financial interest, provided no improper means, such as fraud or malice, are employed). Defendants are not entitled to this privilege.

As alleged here, Defendants fraudulently concealed the discriminatory 340B pricing scheme, causing CVS Specialty to reimburse Plaintiffs less than required under the Agreements, in part based on Wellpartner's false reports. Compl. ¶¶ 105, 159-160, 196-204, 239-243. The scheme depended on each Defendant's distinct participation to wrongfully divert 340B savings to CVS. *See id.* ¶¶ 105-119, 148, 155, 220, 222. Recall that for each transaction at issue, Defendants created two sets of books. The "first set of books" reflects the original adjudication, which was then used to calculate the patient's copay at the point of sale. Soon thereafter, Defendants conspired to reprocess these originally

adjudicated claims to reflect a reimbursement amount that was substantially lower (i.e., the "second set of books"). The result of the scheme was that CVS Specialty was forced to accept a dispensing fee that was below fair market value. Compl. ¶ 148. These allegations show that the non-signatory Defendants intentionally interfered with the Agreements to advance their own economic interests, not those of CVS Specialty. Accordingly, the corporate family doctrine does not apply.

Notably, Defendants have adopted inconsistent positions they fail to reconcile. For example, to defeat Plaintiffs' contract claims, Defendants insist that CVS Health, CaremarkPCS, and Wellpartner are not parties to the Agreements. Mot. at 8-10. Yet, to defeat Plaintiffs' tortious interference claim, Defendants appeal to their close ties with CVS Specialty as signatory to the Agreements. *Id.* at 20. Under these circumstances, Plaintiffs may plead that Defendants are bound by the Agreements or, in the alternative, that the non-signatories tortiously interfered with CVS Specialty's performance under the Agreements. *See* Fed. R. Civ. P. 8(d)(2)-(3).

### C. The Complaint Plausibly Alleges Intentional Procurement Without Justification

Defendants argue that the Complaint does not allege facts showing the Defendants acted "for the purpose of causing CVS Specialty to breach its contract with Plaintiffs." Mot. at 20. However, intent is satisfied where a defendant deliberately interferes with a contract and thereby procures its breach. *Rocket Pharms., Inc. v. Lexeo Therapeutics, Inc.*, 2024 WL 3835264, at *26 (S.D.N.Y. Aug. 14, 2024). New York courts have long recognized that a defendant may be liable where its "deliberate interference results in a breach," even if the defendant otherwise engaged in lawful conduct. *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996) ("where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior"). Here, Plaintiffs allege that CVS Health, CaremarkPCS, and Wellpartner designed and executed a discriminatory pricing scheme, used false reporting instruments

to conceal the scheme, refused to permit an audit that would exposed it, and then retaliated against Plaintiffs for pressing the issue. Compl. ¶¶ 111-19, 160-65. Defendants undertook these coordinated acts "solely to reduce the 340B Remittance" owed under the Agreements and divert 340B revenue to themselves. *Id.* ¶ 117. These allegations establish that each Defendant deliberately interfered with the Agreements and thereby procured CVS Specialty's breach.

### D. Defendants' Reliance on the Agreements' Termination Provisions is Misplaced

Even assuming *arguendo* the Agreements were terminable-at-will, this would not shield Defendants from liability for interfering with the Agreements through fraudulent means. New York recognizes claims for tortious interference with at-will contracts where "the alleged means employed by the one interfering were wrongful as consisting of fraudulent representations or threats…" *Chevron U.S.A., Inc. v. Roxen Serv., Inc.*, 813 F.2d 26, 30 (2d Cir. 1987) (internal citations omitted). The Complaint alleges precisely that. *See* Compl. ¶¶ 160, 196-202, 204, 239-43.

Finally, the Court should reject Defendants' invitation to make a finding of fact that the Agreements were terminable at will. Mot. at 21 ("the contracts were terminable at will"). The Complaint neither alleges nor concedes this fact. To make this finding of fact is to ignore the longstanding rule that inferences drawn from complaints during the motion to dismiss stage must be drawn in plaintiffs' favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In addition, the alleged breaches occurred while the Agreements were in effect. Compl. ¶¶ 115, 157, 165. Defendants cannot avoid liability by recasting Count VII as a claim involving a "discontinued, terminable-at-will contract." Mot. at 22. Accordingly, the Court should deny the Motion on this claim.

## VI. Plaintiffs Plausibly Allege a Claim for Unjust Enrichment

### A. The Parties' Dispute Over the Terms and Scope of the Agreement Precludes Dismissal of the Unjust Enrichment Claim

Defendants argue that the Agreements negate the unjust enrichment claim. Mot. at 22. In New York, however, a valid and enforceable contract generally precludes quasi-contract claims only when

the contract governs the subject matter of the dispute. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009). Courts apply this rule when the terms and scope of the agreement are not disputed and plainly covers the subject matter at issue. *Northwell Health, Inc. v. Group Hospitalization & Medical Services, Inc.*, 2026 WL 2035965, *35 (2d Cir. 2026); *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987). Where the parties dispute the existence or scope of an alleged agreement, courts allow plaintiffs to pursue quasi-contract claims alongside standard contract claims. *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 202 (2d Cir. 2023); *see also* Fed. R. Civ. P. 8 (d)(2)-(3).

The Second Circuit recently applied these principles in *Northwell Health*. There, plaintiff asserted contract and quasi-contract claims to recover unpaid reimbursement from insurers who denied any contractual privity with plaintiff. *Id.* at 35-36. The Second Circuit reversed the lower court's dismissal of Plaintiffs' quasi-contract claims because "the parties vigorously dispute[d] whether the Provider Agreement covers Defendants' conduct with respect to approving and paying Northwell's claims." *Id.* at 37. Much like the *Northwell* defendants, the Defendants here either expressly disavow any contractual relationship with Plaintiffs whatsoever (*i.e.,* CVS Health, CaremarkPCS, and Wellpartner) or, in the case of CVS Specialty, dispute Plaintiffs' allegations describing the conduct giving rise to the alleged breach. Mot. at 8-9, 22. These competing views around the terms and scope of the Agreements preclude dismissal at this stage. *See Northwell Health*, 2026 WL 2035965, at * 37.[12]

**B. Plaintiffs Plausibly Allege Defendants Were Enriched at Plaintiffs' Expense**

Next, Defendants argue that Plaintiffs conferred no benefit on Defendants because the reimbursement payments "originat[ed] from third parties." Mot. at 23. To state an unjust enrichment claim, Plaintiffs need only allege that Defendants were enriched at Plaintiffs' expense and require

---

[12] Defendants' reliance on *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201 (S.D.N.Y. 2016) is misplaced. The Second Circuit has expressly rejected *Mueller's* "maximalist position that the mere existence of a contract pertaining to the same subject matter 'bars any quasi-contractual claims against…a third party nonsignatory[.]" *Northwell Health*, 2026 WL 2035965, at *37-38 (citation omitted).

restitution. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011). "It does not matter whether the benefit is directly or indirectly conveyed." *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quotations and citations omitted). Plaintiffs need only allege "a connection between the parties that [is] not too attenuated." *Northwell Health*, 2026 WL 2035965, at *40 (quoting *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 517 (2012)). Plaintiffs' allegations satisfy this standard.

Here, the Complaint alleges that Defendants reprocessed successfully adjudicated claims to create and retain 340B reimbursement due and owing to Plaintiffs. Compl. ¶¶ 111-19, 151. In other words, Defendants retained for themselves a portion of Plaintiffs' reimbursement to which they were not entitled. Whether the payments "originat[ed] from third-parties" is irrelevant. *See, NLD Rochester LLC v. 440 Lake Ave., LLC*, 686 F. Supp. 3d 248, 254 (W.D.N.Y. 2023) (holding that plaintiff could recover funds owed to it but paid by third party to defendant).

## VII. Plaintiffs Adequately Plead RICO Violations

### A. Plaintiff May Pursue its RICO Claim Alongside its Breach of Contract Claim

Defendants CVS Health, CaremarkPCS Health, and Wellpartner, LLC expressly disavow any contractual privity with Plaintiff. *See* Mot. at 1. Assuming *arguendo* they are correct, Plaintiffs' RICO claim against these Defendants could not possibly sound in contract. *Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497, 503 (S.D.N.Y. 2017) (rejecting argument that "the rule against duplicative fraud claims applies equally to non-signatory corporate officers."). To be sure, privity only between Plaintiffs and CVS Specialty does not "foreclose a [Plaintiffs'] RICO fraud claims, nor does it immunize [Defendants] from the consequences of a pattern of direct misrepresentations to [Plaintiffs]." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 105 (2d Cir. 1993).

In addition, "overlap between factual allegations underlying RICO and state law claims is not a barrier to bringing RICO claims." *Alony v. Chaitchik*, 2026 WL 621513, at *7 (S.D.N.Y. Mar. 5, 2026) (citing *Bd. of Managers of Trump Tower at City Ctr. Condo. by Neiditch v. Palazzolo*, 346 F. Supp. 3d 432, 440

(S.D.N.Y. 2018)). As discussed, the alleged misrepresentations satisfy the "collateral or extraneous" factor because they concerned a "present fact" rather than a promise of future performance. *See* Section IV, above; *see also Merrill Lynch & Co.*, 500 F.3d at 184 (acknowledging rule allowing "fraud claim[s] to proceed in tandem with a contract claim where the seller misrepresented facts as to the present condition of his property, even though these facts were warranted in the parties' contract."). Thus, Plaintiff may pursue its RICO claim alongside its contract claim.

### B. Plaintiff Has Properly Alleged a RICO Enterprise

In the parent-subsidiary context, "corporations in similar, but distinct, lines of business that are under the same ownership structure do not share an identity for RICO enterprise purposes." *Buyers & Renters United to Save Harlem v. Pinnacle Group NY LLC*, 575 F. Supp. 2d 499, 510-11 (S.D.N.Y. 2008) (citing *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 263-64 (2d Cir. 1995)). Here, Plaintiffs allege an association-in-fact enterprise consisting of related, but separate legal entities, operating in distinct lines of business. Compl. ¶¶ 9, 31-36, 155, 160, 210-212. An association-in-fact enterprise is one with "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose." *Boyle v. U.S.*, 556 U.S. 938, 946 (2009).

Here, the "CVS 340B Enterprise" shares a "common purpose of depriving profits and revenue from the administration of Plaintiffs' 340B Drug Program." Compl. ¶ 212 (emphasis added). Plaintiffs describe, in elaborate detail, the relationships among those associated with the "CVS 340B Enterprise" and their interlocking roles in carrying out the scheme. *Id.* at ¶¶ 105-160. As to longevity, Plaintiff alleges that Defendants' scheme has operated continuously "since at least January 2020 and occurring monthly thereafter." *Id.* ¶ 220. Under these circumstances, it would be highly unusual to immunize a parent corporation of liability for doing the very thing RICO was designed to prevent; that is, using legally distinct entities "as a vehicle through which unlawful … activity is committed." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001).

Defendants' reliance on *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.* is misplaced because Plaintiffs do not allege an "enterprise" consisting of a single corporation and its employees or agents. *See Riverwoods*, 30 F.3d 339, 344 (2d Cir. 1994) (rejecting alleged association-in-fact enterprise consisting only of a bank and its two loan officers). As stated above, Plaintiff sufficiently alleges an association-in-fact enterprise consisting of related, but legally distinct entities with different lines of business, which those entities used to carry out a fraudulent scheme to steal 340B monies.

### C. Plaintiffs Adequately Plead Predicate Acts

#### 1. Defendants' Violation of 18 U.S.C. § 664 and 18 U.S.C. § 1954 Proximately Caused Plaintiffs' Injury

Defendants argue that Plaintiffs' injury was not "proximate caused" by Defendants' violation of 18 U.S.C. § 664 (embezzlement) and 18 U.S.C. § 1954 (kickbacks) because the party more directly harmed by these violations were the payors, not Plaintiffs.[13] Mot. at 26.

"Proximate cause" requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). The causal relationship is too remote "where damages to a plaintiff derive from an injury to a third party…." *Bona v. Barasch*, 2003 U.S. Dist. LEXIS 4186, at *72 (S.D.N.Y. Mar. 20, 2003). When evaluating proximate cause, courts often ask whether the plaintiff was "the target[], competitor[], [or] intended victim[] of the racketeering enterprise." *Id.* at *72-73 (quoting *Lerner*, 318 F.3d at 124). Nothing in the Complaint suggests that health plans were the intended targets. While health plans contract with CaremarkPCS for administrative services (Compl. ¶ 73), the allegations describe a scheme to defraud *Plaintiffs*, not health plans. For example, Plaintiffs allege that Defendants "conspired to redirect a substantial portion of these 340B Savings to themselves" thereby preventing "the critical 340B revenue *from reaching Covered Entities*…" Compl. ¶ 3. Thus, Plaintiffs' injury was proximately caused by Defendants' conduct.

---

[13] Defendants appear to concede that Plaintiffs were directly harmed by Defendants' alleged wire fraud.

Furthermore, there is a direct relationship between Plaintiffs' injury and Defendants' violation of 18 U.S.C. § 664 and 18 U.S.C. § 1954. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). As alleged in the Complaint, CaremarkPCS serves as intermediaries between payors and dispensers/pharmacies and health benefit plans. Compl. at ¶ 70. CaremarkPCS manages both the reimbursement to pharmacies and the amounts charged to plans. *Id.* "*[A]ll reimbursement* received by [CVS Specialty] or any of its affiliates from third party payors must be remitted to the Plaintiffs/Covered Entities less the applicable dispensing fee." *Id.* ¶ 92. "As relevant here, much of the reimbursement for 340B drugs come from self-funded employee benefit plans that also provide medical and pharmacy benefits to their members." *Id.* at ¶ 214. However, CaremarkPCS used its position as intermediary to siphon off reimbursement paid by those third-party payors, all of which, minus the agreed dispensing fees, were due and owing to Plaintiffs. Compl. ¶¶ 107-114. This theft was the "proximate cause" of Plaintiffs' injury because Plaintiffs were the intended target of Defendants' scheme and there was no intervening factor between Defendants' fraud and Plaintiffs' injury.

Defendants' reliance on *Empire Merchs., LLC v. Reliable Churchill LLP* is unavailing. There, plaintiff alleged RICO violations arising from defendants' alleged smuggling of alcohol brands for which plaintiff was the exclusive distributor. *Empire Merchs., LLC*, 902 F.3d 132, 141-44 (2d Cir. 2018). The Second Circuit found that plaintiff's injury (loss of sales) was directly caused by the decision of retailers to forgo purchasing alcohol from plaintiff, which was not itself unlawful. *Id.* at 142. Here, Defendants fail to identify any intervening factor serving as the direct cause of Plaintiffs' injury.

**2. Plaintiffs Have Sufficiently Pled Each Predicate Act**

Defendants argue that Plaintiffs failed to plead each predicate act with particularity as required by Rule 9(b). As mentioned previously, "[t]he purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information to frame a response." *Wells Fargo*, 972 F. Supp. 2d at 615. Defendants exaggerate this standard.

As to embezzlement, Defendants argue that Plaintiffs failed to "identify what funds were diverted, when, by whom, why it was unlawful, or which plan's funds they were in the first place." Mot. at 27. This argument would have merit if, as Defendants claim, Plaintiffs devoted only three paragraphs (Compl. ¶¶ 213-15) to support this predicate act. *See* Mot. at 26. However, Defendants conveniently ignore the preceding 200-plus paragraphs describing in painstaking detail the scheme they manufactured to embezzle plan funds. As alleged in the Complaint, Defendants (the "who") mispresented the "gross insurance payment" (the "what") that CaremarkPCS actually received by providing Plaintiff with monthly reports from Wellpartner (the "occasions") showing a total payment that "was materially less than the amount actually adjudicated and paid by the applicable payor at the point of sale[.] …" *See, e.g.,* Compl. ¶ 220. As explained in Section VII.C.1. above, the 340B Savings that Defendants pocketed was, in part, "reimbursement for 340B drugs com[ing] from self-funded employee benefit plans…" Compl. ¶ 214. When read in its entirety, the Complaint gives Defendants notice of what funds they allegedly converted unlawfully and when these conversions occurred.

While Defendants characterize as "key" the absence of allegations identifying "which plan's funds they were in the first place[,]" Mot. at 26, Defendants fail to cite any authority requiring this much particularity with respect to alleged violations of 18 U.S.C. § 664. In fact, this Court has expressly rejected similar arguments claiming that failure to specify the plan assets allegedly converted in violation of 18 U.S.C. § 664 was grounds for dismissal. *See AMA v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 444 (S.D.N.Y. 2008) (finding plaintiffs' allegation that "plan funds specifically earmarked as guaranteed benefits" and defendants' conversion of the same met the pleading threshold). In addition, Defendants have not explained why the absence of allegations specifically identifying the affected plans deprives them of "fair notice" and leaves them without enough "information to frame a response." *Wells Fargo Bank, N.A.*, 972 F. Supp. 2d, at 615 (S.D.N.Y. 2013).

As to kickbacks, Defendants argue that Plaintiffs' allegations supporting this predicate act are insufficient because Plaintiffs fail to allege that any payment received by Defendants constituted a kickback. *See* Mot. at 27. As an initial matter, Plaintiffs *do* allege that Defendants retained a "kickback" or "thing of value" that "exceeds the bona fide compensation and fair market value of the Contract Pharmacy services rendered in relation to the administration of Plaintiffs' 340B program, when conducting the affairs of the CVS 340B Enterprise." Compl. ¶¶ 216-17. When read in its entirety, the Complaint alleges sufficient facts to plausibly suggest that the "thing of value" refers to the diverted 340B Savings. Defendants' argument about whether the 340B Savings retained by Defendants qualify as a "kickback" or instead represents "bona fide compensation" raises a question of fact.

Defendants then interpret the terms "because of" and "with the intent to" as used in Section 1954 as requiring some form of collusion between Defendants and an employee benefit plan to state a claim. *See* Mot. at 27. However, Defendants failed to cite any authority requiring an agreement between the wrongdoer and the employee benefit plan. Nor does the text of Section 1954 require as much. In fact, Section 1954 uses the phrase "*receives or* agrees to receive," suggesting that an agreement is sufficient but not necessary to find liability under Section 1954. 18 U.S.C. § 1954.

Finally, the named Defendants include certain John Does "who executed and ratified the fraudulent arrangement" on behalf of each corporate Defendant. Compl. ¶¶ 37-40. These John Doe Defendants are indictable as contemplated by Section 1954, and Defendants do not suggest otherwise. Accordingly, Plaintiff has alleged sufficient facts to state a claim under 18 U.S.C. § 1954.

With respect to wire fraud, Defendants' argument that Plaintiffs' RICO claim is nothing more than a breach of contract fails for the reasons discussed in Section VII.A., above.

Defendants further argue Plaintiffs failed to allege wire fraud with sufficient particularity. According to Defendants, the second and third subparts of Paragraph 220 of the Complaint "do not allege that any information contained in the documents was factually inaccurate." Mot. at 28. This

argument rests on an incomplete reading of Paragraph 220. The *first* subpart of Paragraph 220 (styled "Wellpartner Monthly Electronic Remittance Reports") plainly alleges that "Wellpartner transmitted to Plaintiff[], via interstate electronic data transmission, monthly remittance reports" that "*falsely* reflected a gross insurance payment to CVS Specialty that was materially less than the amount actually adjudicated and paid by the applicable payor at the point of sale..." Compl. ¶ 220. (emphasis added). The second and third subparts describe the mechanisms by which Defendants operationalized their scheme. *See* Compl. ¶ 220. When read together, Plaintiffs sufficiently allege that Defendants used interstate wire communications to falsely represent the gross insurance amount paid on 340B claims and conceal those false representations in violation of 18 U.S.C. § 1343. Those communications were "incident to an essential part of the scheme" including the transmission of "Wellpartner Monthly Electronic Remittance Reports" that *did* contain false information. *Schmuck v. U.S.*, 489 U.S. 705, 711-12 (1989). Therefore, the predicate act of wire fraud is sufficiently pled.

Defendants also contend that "Plaintiffs fail to plead any factual support showing that Wellpartner's reports purported to reflect the amount 'paid by the applicable payor,' rather than the reimbursement received by CVS Specialty." Mot. at 28. This argument is irrelevant to this analysis. Under Rule 9(b), it is sufficient to allege that the Wellpartner reports "falsely reflected a gross insurance payment to CVS Specialty that was materially less than the amount actually adjudicated and paid by the applicable payor at the point of sale…" Compl. ¶ 220. Putting aside Defendants' refusal to permit an audit that would have revealed many of the facts they now claim are missing from the Complaint, whether the reports made available to Plaintiffs contained, or should have contained, additional information is an issue for discovery, not dismissal.[14]

[14] Finally, Defendants argue that any false reporting of the patient copayment has "no nexus whatsoever to Plaintiffs' theory of wrongdoing in this case[]" and is not material. Mot. at 28-29. The material nature of this allegation is evident from the Complaint, which alleges that "the false reporting of patient co-pay/co-insurance as $0.00 *further concealed the true point-of-sale transaction from Plaintiffs*…" Compl. ¶ 225 (emphasis added). By distorting the copayment amounts, Defendants prevented Plaintiffs from understanding their patients' financial

## VIII. The Court Should Not Dismiss the New York General Business Law Claim

Contrary to Defendants' position, Plaintiffs' claim arising under Section 349 of New York's General Business Law is "consumer-oriented." *Schuman v. Visa U.S.A., Inc.*, 788 F. Supp. 3d 563, 574 (S.D.N.Y. 2025). Conduct is "consumer-oriented" when it is "directed to the consuming public and the marketplace." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.*, 37 N.Y.3d 169, 177 (2021). Section 349 of the General Business Law applies "to virtually all economic activity, and [its] application has been correspondingly broad." *Plavin v. Group Health, Inc.*, 35 N.Y.3d 1, 9 (2020). There is no question that looting the 340B Program has a broader impact on consumers at large. The very purpose of the 340B Program is to "stretch scarce federal resources and fund indigent care." Compl. ¶ 2. Plaintiffs allege that the 340B drugs at issue are "outpatient prescription drugs purchased by [Covered Entities] for their patients" (Compl. ¶ 51), that the Agreements exist to serve "ultimately indigent and un-insured patients—the intended beneficiaries" of the program (*id.* ¶ 3), and that the funds Defendants diverted are "funds that Congress intended to flow to the Covered Entities and their patients." *Id.* ¶ 184. Diverting 340B revenue used to fund care for indigent and uninsured patients is certainly "consumer-oriented."

## IX. The Complaint Contains Sufficient Facts as to CVS Health's Direct Participation

Defendants argue CVS Health cannot be liable for the acts of its subsidiaries. While a parent corporation is distinct from its subsidiary and generally not liable based solely on its controlling interest, this rule has no application where the parent is directly liable for its own misconduct. *See Greene v. Long Island R.R.*, 280 F.3d 224, 234 (2d Cir. 2002). Courts will pierce the veil between parent and subsidiary where the parent dominates its subsidiary to commit "fraud or other wrong," resulting in unjust loss or injury to Plaintiffs. *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.,* 766 F.3d 212, 224

responsibility, which could have unlocked access to financial assistance programs funded by Plaintiffs' 340B Savings. These financial assistance programs are critical for low-income patients, who often ration their medication or forgo treatment altogether because they cannot afford it.

(2d Cir. 2014). The Complaint's facts satisfy both direct liability and veil-piercing theories. Specifically, CVS Health executed and ratified the fraudulent scheme by "establish[ing], … and direct[ing] the internal policy to reduce reimbursement rates on 340B-identified claims after the point of sale[,]" and directing Wellpartner to provide Plaintiffs with false information. Compl. ¶¶ 37, 220.

Additionally, Plaintiffs set forth facts sufficient to satisfy the "domination," "fraud or other wrong," and "unjust loss or injury" prongs of a veil-piercing analysis, as explained in Section I.B, above. *See* Compl. ¶¶ 9, 72, 79, 85. Plaintiffs further allege that CVS Health was aware of the immense profit Defendants' scheme generated and treated that profit as its own. Indeed, CVS Health's own SEC filings acknowledge that the reduction in 340B Contract Pharmacy revenues could "materially and adversely affect" CVS Health's financial results. That admission shows that the retention of 340B Spread was a deliberate and financially significant business decision made at the corporate parent level, not an act of a subsidiary acting independently. *Id.* ¶ 222. The Court should not dismiss CVS Health.

## CONCLUSION

For the reasons stated herein, the Court should deny Defendants' Motion to Dismiss entirely. To the extent the Court finds Plaintiffs' claims are not adequately pled, Plaintiffs respectfully request a dismissal without prejudice so that they may amend the complaint to cure any deficiencies.

Dated: August 26, 2026

Respectfully submitted,

FRIER LEVITT, LLC

By: */s/ Matthew J. Modafferi*
Matthew J. Modafferi
Jonathan E. Levitt
Todd Mizeski

One World Trade Center
Suite 45E
285 Fulton Street
New York, NY 10007
Telephone: (646) 970-2711

jlevitt@frierlevitt.com
mmodafferi@frierlevitt.com

84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650

*Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of August, 2026, a true and accurate copy of the foregoing document was filed electronically through the ECF system and counsel of record received notification via ECF.

Dated: August 26, 2026

Respectfully submitted,

By: */s/ Matthew J. Modafferi*

Matthew J. Modafferi
FRIER LEVITT, LLC
One World Trade Center
Suite 45E
285 Fulton Street
New York, NY 10007
Telephone: (646) 970-2711
mmodafferi@frierlevitt.com

*Attorney for the Plaintiffs*